John Kajnik, Administrator of the Estate of Zoltan Kajnik, Deceased, Appellant, v. Village of Divernon and The Divernon Telephone Exchange, Appellees.

## Gen. No. 8,054.

1. DIRECTING VERDICT—*evidence precluding*. Upon defendants' motion to direct a verdict, on the ground that the evidence did not show defendants were guilty of negligence which was the proximate cause of plaintiff's intestate's death and that said plaintiff's intestate was guilty of contributory negligence as a matter of law, if there was any evidence from which the jury could reasonably find the material allegations of the declaration true, the motion should not be granted.

2. ELECTRICITY—*when negligence proximate cause of injury*. Upon plaintiff's evidence that defendant telephone company threw a roll of wire upon a high power electric wire in a tree in the public street of defendant village which had allowed it to so remain for over two years partly hanging near the ground and to so wear into contact that the hanging wire became dangerously charged, it was a question of fact for the jury whether defendants were guilty of such negligence as would be the proximate cause of the death of a boy who grasped the wire while playing about the tree.

3. ELECTRICITY—*when contributory negligence question for jury*. Whether a boy under 17 years of age who grasped a wire hanging from a tree standing in a public street while playing in the street, and who was killed by an electrical discharge therefrom, was guilty of contributory negligence was a question for the jury.

Appeal by plaintiff from the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding. Heard in this court at the October term, 1926. Reversed and remanded. Opinion filed February 28, 1927. Rehearing denied April 12, 1927.

JOHN G. FRIEDMEYER, for appellant.

DE WITT S. CROW and GRAHAM & GRAHAM, for appellees.

MR. JUSTICE NIEHAUS delivered the opinion of the court.

In this case suit was commenced by John Kajnik as administrator of the estate of Zoltan Kajnik, deceased, to recover damages for the benefit of the next of kin of the deceased, from the Village of Divernon, a municipal corporation, and the Divernon Telephone Exchange, charging them with negligence, which it is alleged, caused the death of the deceased. The declaration alleges that the Village of Divernon was then and there a municipal corporation, and the Divernon Telephone Exchange was a corporation organized under the corporation laws of the State, and was engaged in operating a certain telephone system in the Village of Divernon; that it then and there owned certain poles and telephone wires, strung upon said poles, and certain telephone lines throughout the village, and conducted a telephone exchange with other lines of the same character; that the Village of Divernon, as a municipality under the provisions of the statutes and the ordinances of the village, was possessed of a certain electric light and power plant, fully equipped for the purpose of generating electric power for lighting the village, and for the disposition of electric current for mercantile use, and for furnishing electric current to other institutions and business, and was possessed of certain poles and wires strung thereon, set upon and along certain streets throughout the Village of Divernon, and along certain public highways connected therewith, and connected with the power plant, and with distributors, to distribute electricity by means of wires throughout different parts of the Village of Divernon, and within the corporate limits thereof; was

engaged in furnishing electric current and power to the inhabitants and business of the village for lighting and power purposes, and providing electric current for lighting the streets and public places and buildings in the village; that the Village of Divernon by its officers and agents then and there possessed a certain line of poles and electric light wires strung upon the poles upon a certain street in the village known as State Street, for the benefit of the property owners on each side of the street, and at a certain place in said street caused certain lead wires to be attached in the proximity of a certain pole supporting its wires conveying electric current from this place for commercial use, and extending from its power line above and through certain shade trees located in said street, over the sidewalk into certain private property located on the west side thereof, to bring in its electric current to a certain dwelling house located thereon, to provide the owner thereof with electric current for lighting his dwelling house and building, and for such use as he desired to put the same to, which wires were known as feeders, and were loosely strung across said street to a certain tree located in front and near a dwelling house on the west side of the street; that the Village of Divernon used said wires as stated, strung on its poles in said street as high tension wires which were insulated, and conveyed a current of 3000 volts of electricity; that the lead wires or feeders connected with said high tension wires referred to, and loosely strung across the street and through certain trees in front of the property referred to, on the west side of the street, were so attached and used by the defendant to convey an electric current from said high tension wires into a certain dwelling house to be used for commercial lighting and power purposes; that the Divernon Telephone Exchange, before the time in question, had removed certain telephone wires that it possessed over a certain telephone line located on the

west side of the same street, and had theretofore rolled up and thrown a large quantity of telephone wires into the shade tree, and across the electric feed wires of the Village of Divernon, and had permitted the same to lie in that position, in connection with said electric light and power wires, which conveyed the heavy current of electricity mentioned, so that the insulation of the feed wire became worn, and the telephone wires mentioned came in contact with the electric feed wires which caused the telephone wires to become heavily charged with electricity of about 2000 volts; that the appellees negligently and carelessly permitted the telephone wires to continue over and across the heavily charged feed wires for a long space of time of about one year with loose ends of said wires hanging down through the branches of the trees within about six feet of the ground in close proximity to the sidewalk on the west side of the street mentioned; that the Village of Divernon permitted these telephone wires to so remain lying upon and crossing over its feed wires, and thereby negligently and carelessly permitting the same to become charged with electricity, and negligently failed to remove these wires to prevent any persons accidently coming in contact therewith from being injured thereby; that the appellees then and there had notice of the dangerous condition mentioned at the place referred to in the street of the village, or by the exercise of reasonable diligence could have known that the telephone wires in the immediate proximity in connection with the light wires would endanger the life of any person coming in contact therewith, if charged with the electric light current referred to, and negligently failed to remove the same, but allowed the telephone wires to lie over its electric feed wires in full contact therewith, and that they became charged with electricity; and that Zoltan Kajnik, the deceased, a minor under the age of 17 years, who did not know that the telephone wires hanging down

through the branches of the shade tree referred to upon the street in question near the sidewalk were charged with the electric current mentioned; and that while he was engaged in play with other boys, and under this shade tree, came in contact with one of these telephone wires, and the electric current thereby conveyed by this means passed through his body, in consequence of which he was instantly killed.

On a trial of the case, and at the close of the plaintiff's evidence, the court on motion of the appellees directed the jury to find the appellees not guilty, and thereupon entered a judgment in bar of the suit. This appeal is prosecuted from the judgment.

It is insisted by the appellees that it is proper to direct the verdict because the negligence charged against the appellees was not the proximate cause of the death of Zoltan Kajnik, and because the evidence shows that he had been guilty of contributory negligence as a matter of law, and the question presented for our consideration on this appeal is whether there is any evidence tending to prove that the appellees were guilty of negligence as charged in the declaration which was the proximate cause of the death of the deceased, and whether it appears from the evidence that the deceased was guilty of contributory negligence so conclusively as to become a matter of law. In *Kelly v. Chicago City R. Co.*, 283 Ill. 640, the court considered the questions here involved. It is there said: "As a general proposition, the question of contributory negligence is one of fact for the jury under all the facts and circumstances shown by the evidence, (*Bale v. Chicago Junction Railway Co.*, 259 Ill. 476,) but cases occasionally arise in which a person is so careless or his conduct so violative of all rational standards of conduct applicable to persons in a like situation that the court can say, as a matter of law, that no rational person would have acted as he did and render judgment for the defendant." And it is said

in *Devine v. Delano,* 272 Ill. 166, "One of the principal questions argued by counsel is whether plaintiffs in error's negligence was the proximate cause of the deceased's injury and death. This was a question of fact to be submitted to the jury, and the rule applicable when considering a motion to direct a verdict has been frequently stated by this court. In *McGregor v. Reid, Murdoch & Co.,* 178 Ill. 464, it is said (p. 471): 'All that the evidence tends to prove and all just inferences to be drawn from it in appellant's favor must be conceded to him. * * * Under the rule the evidence most favorable to appellant must be taken as true. * * * The credibility of the witnesses, the weight of the testimony, the drawing of the inferences of fact from facts proved, were all questions of fact for the jury to pass upon and not for the court to decide.' * * * If there is in the record any evidence from which, if it stood alone, the jury could, without acting unreasonably in the eye of the law, find that all the material averments of the declaration have been proven, a verdict should not be directed. (*Libby, McNeill & Libby v. Cook,* 222 Ill. 206, and cited cases.)"

On the trial to sustain the right of recovery as set forth in the declaration, the appellant called Joe Barnwell as a witness. He testified, after stating that he had lived in Divernon 18 years, and that that was his age, as follows: "I knew Zoltan Kajnik in his lifetime, and was acquainted with the premises near Tokosh's house where the electric light wires were, and had been there frequently before January 16th, 1925, the day Zoltan was killed. I saw some old telephone wires in connection with a certain tree under which he was killed. Saw them about 2 or 3 months before that. They were laying right on top of the electric wires when I saw them, just rolled up in a big ball or ring, and just laid on top, and there was one came down and went back up again. The wire had grown to the tree

and the bark went around one part, it was the string
the bark grew around. That bundle of wire was lay-
ing on top of the electric wire; it come down and went
back up, and then had grown into the tree. There was
a loose strand hanging down towards the ground that
I saw before the boy was killed. It was about 4½ feet
from the ground, and about a foot and a half to the
body of the tree, and was rusty. I never had anything
to do with that wire before. I was there getting a
shock myself from the tree. I saw the string of wire
hanging down towards the ground the same day the
boy was killed, and saw it before that time a good
while. I don't know how close to the electric light wire
it was. It was against the bunch of wire and the
strings I have described. I had been there about 15
minutes before this boy got killed." Another witness
who testified, concerning the matters in controversy,
was Algert Jutelis. He stated that he was 14 years
old and lived in Divernon at the northeast corner of
the block where the tree is where Zoltan was killed,
and testified: "I lived there about 8 years, and during
that time have played around in the locality, and
noticed some old telephone wires lying in the trees
under which Zoltan was killed. I noticed them there
about 3 years before he was killed. The wire wasn't
used so long,—it was against the limb and stayed there
so long that it grew in. It was all bunched up and over
the electric wire and then a piece came down and then
went back up into the bunch of wires. The bunch
layed on top of the electric wires. This strand that
went down and then went up again was about 3½ feet
from the electric wires, and came about 4½ or 5 feet
from the ground. It was a loop coming down and
then going up. It was about 2 or 3 feet away from
the tree and it was very rusty. It was something like
steel wire, it would be shiny inside of it. I had seen it
hanging there before it was taken off, it was in the
summer time when we was playing ball on the road,

I think that wire was still bunched up there, but it wasn't quite so low. The boys didn't play so much around the trees, just used them for bases when they played ball. * * * You couldn't help but see the wire if you walked past. I was there the day Zoltan was killed. My mother sent me up town to get some stuff for her, and I came up that way taking it to her and some kids were playing, and they said 'Come here, Algert, we will get a shock,' and we went by the post and getting shocks, then there were some bigger kids over by the tree, and then I went over there and played with them. One boy would put his foot on the tree and get hold of my hand and I would get hold of some other boy's hand, and we would get a shock that way. They put their foot on the body of the tree. After the other boys left, Zoltan would put his foot on the tree, he would get hold of my hand and I would get hold of Paul's and the other boys' hands, and we would all get shocked that way. I didn't think the string of wire hanging down from the tree was charged, but I could see some of the telephone wire on the tree that was smoking. I didn't know it was charged. I saw Zoltan get the shock that killed him. He got hold of the wire coming down and going back up to the bunch of wires, the wires didn't look like they were charged. He got hold with his right hand; he had a glove on; as soon as he grabbed hold of it he fell against the tree, then all of us scattered." The record contains testimony of other witnesses for the appellant which tends to corroborate the evidence set forth, and concerning the fact that the wires in the tree which was standing in one of the streets of the village were telephone wires that were no longer used by the telephone company, but had been discarded and allowed to remain in the tree referred to, and in close proximity to the high tension light and power wires owned and used by the Village of Divernon, and that the wires had been in the tree and in that situation

mentioned probably two or three years, a sufficient length of time that the village would legally be charged with notice of fact that the wires were there. Under these circumstances and in this state of the record, we are of opinion that it was a question of fact for the jury to pass upon, whether or not it was negligence on the part of the telephone company, as well as on the part of the village, to allow these wires to be placed in the tree and to remain there indefinitely, in a situation where by the effect of elements, and the winds, and the storms which are likely to occur might cause the discarded telephone wires to come into contact with the high tension light and power wires of the Village of Divernon, and thereby become dangerous to life by becoming charged with a death-dealing current. It was a question of fact for the jury, whether or not the deceased was guilty of contributory negligence in taking hold of the wire in question to get an electric "shock," because it involves a determination of whether or not the deceased knew, or had good reason to believe or know, that the shock which he would receive would be from an electric current that might cause an injury. In *Commonwealth Electric Co. v. Melville*, 210 Ill. 70, it was held that a company operating wires carrying a dangerous current of electricity owes a duty to exercise reasonable care to prevent injury to others, wherever they have a right to go. The duty extends to every place where persons have a right to be, whether for business, convenience or pleasure. And in *Rowe v. Taylorville Electric Co.*, 213 Ill. 318, the court pointed out: "The streets of the city were not the private premises of defendant. The streets belong to the public, and the public, generally, have a right to use them. As a matter of fact, the defendant must be held to have anticipated that the public would use the streets as they had a right to do. * * * The defendant was not an insurer of the safety of the public, but it was bound to know the dangers

incident to the use of the streets·by it and to guard against such dangers by the exercise of care commensurate with them.''

For the reasons stated, we are of opinion that the court was in error in directing a verdict; and the judgment is therefore reversed and the cause remanded.

*Reversed and remanded.*